# PLAINTIFFS' EXHIBIT "B"

STATE OF ILLINOIS    )
                     ) SS:
COUNTY OF C O O K.    )

           IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
           MUNICIPAL DEPARTMENT-THIRD MUNICIPAL DISTRICT

IN RE:  THE MATTER OF                      )
                                           )
      GARY MOTYKIE                         )
                                           )
             Petitioner,            )
    and                                    ) No. 21 OP3 1013
                                           ) No. 21 OP3 1014
      CHRISTOPHER BONO and                 ) No. 21 OP3 1015
      KATHERINE TORBICK and                )
      KEVIN MOTYKIE,                       )
                                           )
             Respondents.           )

### EMERGENCY ORDER OF PROTECTION

     REPORT OF PROCEEDINGS had at the hearing of the above-entitled cause before the Honorable JOEL GREENBLATT, one of the Judges of said Court, on the 23rd day of December, 2021.

APPEARANCES:

        MR. JOSEPH HOWARD,
        Appeared on behalf of the Petitioner.

Reported by:
Jill Raddatz
Official Court Reporter
Third Municipal District
084-002564

1

Plaintiffs' Exhibit "B"  002  of  18

THE COURT: 21 OP3 1013, Gary -- is it Motykie?  Can't read it.  Step up.  Go to the podium.  Are you Mr. Gary?

MR. HOWARD: I am not.  I am Joe --

THE COURT: Where is your client?

MR. HOWARD: Right here, he's right here, walking into the courtroom, your Honor.

THE COURT: Mr. Gary, step up.  Raise your right hand, sir.

(Witness sworn.)

THE COURT: Put your hand down.  Keep your voice up nice and loud.

DR. GARY MOTYKIE,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY THE COURT:

Q.  Tell me your name and spell your last name for the court reporter slowly.

A.  Gary, G-a-r-y, M-o-t-y-k-i-e.

Q.  Thank you.  All right.  It looks like you've got three.

THE COURT: Counsel, once again, your name slowly for the reporter.

MR. HOWARD: Your Honor, Joseph Howard.  Last name H-o-w-a-r-d, on behalf of Dr. Motykie.

THE COURT: Thank you.  There are three files, madam reporter,

2

Plaintiffs' Exhibit "B"  003  of  18

21 OP3 1013, 1014, 1015.  Let's take a look at 1013.

Q.  How do you know someone named Christopher Bono, B-o-n-o?

A.  I don't know him.  He was -- my brother moved him into my house when I was out of town.

Q.  So do you share a residence with him?

A.  No.  With my brother.

Q.  So you share a residence with your brother?

A.  Yes, sir.

Q.  And Mr. Bono is living in that residence?

A.  Yes.

Q.  Okay.  That's in 1013.  In 1014, how do you know someone named Katherine Torbick?  Is it Tor or Torv?

A.  Torbick.

THE COURT: T-o-r-b-i-c-k, Katherine with a K.

Q.  How do you know that person?

A.  It's my brother's girlfriend.

Q.  Does she live in the house?

A.  Yes.

Q.  And in 1015, Kevin Motykie.  And I apologize if I mispronounce it.  M-o-t-y-k-i-e.  Who's that?

A.  That's my brother.

Q.  Okay.  You live in Inverness; is that correct?

A.  Yes, sir.

Q.  What type of residence is located on Glencrest Drive?  Is it

3

Plaintiffs' Exhibit "B"  004  of  18

a single family residence?

A. Yes. It's a house.

Q. A house?

A. Yes.

Q. Who is the owner of the residence?

A. I'm the owner.

Q. You are the legal titleholder?

A. Yes.

Q. Is your brother entitled to the residence at all?

A. He had signed a lease with me.

Q. But he's not an owner?

A. No.

Q. So he is a tenant of yours?

A. Yes.

Q. Why are you here today seeking an order of protection against Christopher Bono? What did he do that causes you to come here today?

A. Well, I came into town a few weeks ago for Thanksgiving and --

Q. Do you not live at that residence?

A. I live in California and here, both places. I have a home in California and a home here and I have a medical spa business in both places, so I do surgery and medical procedures at both places.

4

Q.  All right.

A.  So I bought a house here in 2019 to start coming back to move back here.  And when I opened the med spa I was going to have my brother help manage the med spa.  And I bought the house in 2019 --

Q.  The house in Inverness?

A.  The house in Inverness.  And then Covid hit and I wasn't able to come back that often.  While I was away, my brother kind of moved into the house, moved his girlfriend into the house and then moved this Christopher Bono into the house, so I was unaware that this person moved into the house, and when I came back at Thanksgiving apparently had moved into my room and I had no idea who this person was.  And from what I alleged he had moved into the house because my brother and his girlfriend were having domestic disturbances and fights and threatening to kill each other and somehow this guy moved in to be their, quote, bodyguard, and I don't know if it was, you know, what he was doing in the house.  So when I moved in I had no idea.  He just showed up and he's in my room.

Q.  When did you get back to the house?

A.  It was Thanksgiving.

Q.  And what's occurred between Thanks -- have you been here continuously since Thanksgiving?

A.  No.  I had to leave and go back to California, but when I

5

Plaintiffs' Exhibit "B"  006  of  18

came in that's when everything went off the rails.  My brother was having these paranoid delusions and crazy and it was just like a horror house in there.

Q.  I'm only talking about Bono right now.  So what I'm hearing you say is that Bono was a guest of your brother's who's now taken up residence there?

A.  Correct.  And so when I got there he -- there was a lot of things -- he was going to the med spa and he was threatening employees there and pulling knives out and he's threatening that he's going to come after me.

Q.  That's something that is important to me.  When did he threaten you?

A.  So what happened was -- so when they -- I'm trying to tell you what hap -- so the employees -- we went to the med spa to change the locks.  When I came back to the house my brother called Chris Bono and said get the keys from --

Q.  Get the keys from?

A.  Me.  My broth -- get the keys from Gary because I changed the locks there because employees were scared because Chris was showing up at the med spa and threatening the employees and me. And so my brother called him and said to get the keys from me because Chris was at the house, Chris came up to the house, and he said directly to me, get over here right now and give me the keys to the med spa and I said, no, it's my med spa, I'm not giving you

6

my keys.

Q. What did he do to you? What did he say to you?

A. Then he said get your punk ass over here. I'm going to beat your ass up and take the keys. And I said, I'm going to call the police. This is crazy. Get out of my house. And then he said, no --

Q. When was this?

A. It was like two or three days right after Thanksgiving.

Q. Did you call the police?

A. Yes. So we called the police and the police came and while the police were on the way he said, that's fine, if you kick me out of the house I'm going to go break into your med spa as soon as I leave. So the police showed up. They got him off my property.

Q. The property at the medical spa or at the house?

A. The Inverness house.

Q. At the house. Has he been back since then?

A. Yeah. He came back the next night.

Q. Since four days after Thanksgiving has he been back?

A. Well, that night the police came and removed him. Later on it was either -- I think it was the next night that he came back again with my brother. It might have been the same night.

Q. Okay. All right. But we're talking about at least four weeks ago. Has he been back in the last four weeks?

7

A. I don't know if he's been back over there.

Q. Because you haven't been there?

A. No, I didn't go back.

Q. When did you come in most recently?

A. I came in yesterday morning.

Q. Yesterday?

A. Yes.

Q. And you don't know if he's there or not?

A. I don't know because I'm just petrified to go over there, but, but -- and, I'm sorry, there was one thing that happened before that was -- it was either the morning before that I was asleep and Katherine, my brother and him, grabbed me out of my room and brought me downstairs and started questioning me about all these crazy delusions about cameras in the house, like, you know, thinking I'm involved in it, and while they were talking and screaming at me for like two hours Chris pulled a gun out and put it on a table in front of me and so that's when I got scared at first. Then the next --

Q. Stop right there. In your affidavit you allege in paragraph 28 that on November 29th Mr. Kevin said, quote, your days are numbered, end quote; is that what he said?

A. Yes, sir.

Q. And, quote, you don't understand who you're messing with, end quote?

8

Plaintiffs' Exhibit "B" 009 of 18

A. Yes, sir.

Q. Quote, you are a dead man walking, end quote?

A. Yes, sir.

Q. And, quote, you better watch your back or you won't ever see it coming, end quote; is that correct?

A. Yes, sir.

Q. And those threats were made directly to you?

A. Yes.

Q. By Mr. Kevin?

A. Yes.

Q. All right. You understand that an order of protection proceeding is not a vehicle to dispossess someone of --

A. I understand.

Q. You understand that? That was why I'm asking you about these alleged threats because that is a basis for a protective order. Are you afraid of Mr. Bono?

A. I'm afraid of all of them.

Q. I'm asking about Mr. Bono?

A. Yes, sir.

THE COURT: Counsel, is the affidavit for Torbick identical?

MR. HOWARD: It is, your Honor.

THE COURT: Thank you.

Q. Now, has Ms. Katherine Torbick, has she threatened you as well, sir, or not really?

9

Plaintiffs' Exhibit "B" 010 of 18

A. She is just kind of -- she's -- I know she has a psychiatric history and she's in the house with them and she just informs them like where I'm at or what I'm doing and they're just kind of like a big team together, you know, they just all work together.

Q. I understand, but in order for me to grant you the relief you're seeking against each I have to make certain findings for the purpose of the court record and I need to know on what basis you are seeking an order of protection against Katherine; in other words, what has she done to you? I know she's kind of friends with your brother.

A. There's only a couple of times that I was actually scared of her was that morning when she dragged me out of my room and brought me downstairs.

Q. She physically did that?

A. No.

Q. She just was with your brother and the other gentleman?

A. Yeah, but she was by herself and she came up to my bedroom and was just -- she basically was banging on my door for about ten minutes straight and brought me downstairs. It's just the delusions and the crazy talk that she's just with them, and then while she's in the house I guess the reason Chris was there was to protect my brother from her because she was threatening to kill him, and so when she was in the house I was scared for my own life. She ripped the alarm systems off the wall. She's --

10

Plaintiffs' Exhibit "B" 011 of 18

Q. She's damaged property in your home?

A. Yes.

Q. You've seen her do that?

A. Yeah. Well, he told me she ripped the alarm system off the wall and when I came into town I saw the alarm system ripped off the wall.

Q. So you got that secondhand information. You didn't actually see that happen but someone told you she did that?

A. Yeah. And then I saw that. And, you know, so I was already petrified of her because the reason that apparently this Chris guy was in the house was to protect my brother from this girl. It was just crazy and I didn't know what was going on. And then after I left she was making phone calls to me like in the middle of the night. She would call me with these crazy --

Q. In California?

A. Yeah. She would call me with this craz -- like two, three in the morning with --

Q. What would she say to you?

A. She was saying somehow I'm involved with the cameras in the house, and she was saying F you and F that and, you know, just swearing and yelling at me on the messages on the phone.

Q. When is the last time you saw her or talked to her?

A. Well, Thanksgiving. She did try to call again about a week ago. She went over to the medical spa. So they had to get a

11

Plaintiffs' Exhibit "B" 012 of 18

non-trespass --

Q. So why is it an emergency today and it wasn't an emergency back at Thanksgiving time?

A. It was and we tried to come in at Thanksgiving but we couldn't figure out how to get the process done in time. We came over here to get the restraining order. We couldn't figure out how to do it and I had to go back to surgery up there. And so then coming back out here we had ended up staying in a hotel and coming back out here. I'm just petrified. I'm staying in a hotel now. I don't want to go near my house or anywhere they know where I'm at. And when I came back into town on this Friday night before I came into town, so this past Friday I got a phone call from my brother's -- he has a son -- his, his -- the mother and she told me she had spoke to him.

Q. Spoke to who?

A. My brother on the phone -- oh, no. In person, she met with my brother in person and my brother in person told her and that's why she told me that when I come into town my brother and Chris or whoever are going to hunt me down, beat me up and try to break my fingers, so I have been scared ever since I came in to get in here and get this.

Q. So you haven't stayed at the Inverness house at all?

A. No. I'm staying at a hotel. I don't want anyone to know where I'm at and I don't want her informing them where I'm at or

12

knowing where I'm at.  I don't want any of them knowing where I'm at.

THE COURT: Thank you, sir, for your testimony.  The record shall reflect as follows.  With regard to all three matters I find that you are protected under the provisions of the statute which is known as the Illinois Domestic Violence Act.  I find that there is a sufficient allegation of abuse as defined in the statute.  I also find that an emergency does, in fact, exist in that the harm the petition seeks to prevent may occur if advanced notice is given.

Accordingly, in each of the three numbered matters there will be an emergency order of protection issued today.  These orders are temporary only, sir, only good for 21 days, three weeks.  If you would like a more permanent order for up to two years you've got to do a couple of things.

First, each of these respondents has to be served with the papers.  They have to know that there's going to be a hearing.  In just a few moments you'll have a seat on the benches.  The deputy will bring you all your papers back.  You go with your attorney back to the ladies in the window in room number 123.  You were just there a little while ago, the sheriff's representatives.

You place the papers there for service with the sheriff.  Now, perhaps the Inverness police will serve them.  You work that out with the sheriff's representatives and then you can find out

13

through them when they have been served because when they have been served, officers are going to take them out. Did you provide one time access with law enforcement or no?

MR. HOWARD: I don't think so.

THE COURT: I'm going to leave it the way it is right now. You know what? Do you have all three of the files?

THE CLERK: Yes, Judge.

MR. HOWARD: I do believe the Sheriff's Office had my information as well as my client's.

THE COURT: Yes, but you're the one who has to coordinate and find out, you know, how you go about finding out. They're not just going to pick up a phone and call you.

MR. HOWARD: Right. I'll deal with them.

THE COURT: Right. Okay. What my thought was that I would give each of the respondents one time access after they've been put out to come back with law enforcement to gather their personal belongings, okay, because they're going to put them out. I need those orders back. Can you get them for me, please? I need to change it on the one time access. That's my error and I apologize. Thank you. Okay. This is Mr. Kevin. Whatever needs to be re-copied they'll have to re-copy it. So this is done for Mr. Kevin. This is done now with law enforcement for Ms. Katherine. And this one is done now for Christopher. Okay. All right.

14

Plaintiffs' Exhibit "B" 015 of 18

So what I'm providing is one time access after they've been put out because when they come to serve him, they're going to say come with us. I'm going to let them go back one time with an Inverness police officer to gather up personal belongings, okay?

Now, I take it you don't want to be there when the officers come. That's why it's a good idea to have your counselor or you can check to find out when it's safe to go back. If they're out, then you can change the locks obviously, okay? So that's the first thing, service.

Next, you have to return to this courtroom three weeks from today. Now, if you are going to be out in Los Angeles, I'm going to let you Zoom in that day from a remote location. Sheriff, do you have the Zoom sheet for the gentleman? And, in fact, give one to counsel also if you have a couple with the Zoom numbers on it.

You'll locate room number 107. That's the I.D. number and the password. I do my call in the afternoons at 1:30 on the 13th of January. It's going to be on your papers. My suggestion is if you are doing it remotely, if you're not in town, that you Zoom in no later than 1:20 so that you're in my waiting room so that when we start court I can let you in and you can at least on this first court date come in remotely, okay?

THE PETITIONER: Yes, sir.

THE COURT: Any questions?

THE PETITIONER: No, sir.

15

Plaintiffs' Exhibit "B" 016 of 18

THE COURT: If they've been served on the 13th of January, you can then ask me for a more permanent two-year protective order because this is only good for three weeks, okay?

THE PETITIONER: I understand.  Okay.

THE COURT: Have a seat.  Wait for your papers.  Good luck to you.

MR. HOWARD: Thank you very much, your Honor.

THE COURT: Thank you, counsel.

(Which were all the proceedings had.)

16

Plaintiffs' Exhibit "B"  017  of  18

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

MUNICIPAL DEPARTMENT-THIRD MUNICIPAL DISTRICT

I, Jill Raddatz, Official Court Reporter for the Municipal Department, Third Municipal District, do hereby certify that I reported in shorthand the report of proceedings had at the hearing in the above-entitled cause; that I thereafter caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate transcript of the report of proceedings had before the Honorable JOEL GREENBLATT, one of the Judges, of said Division.

_____
Jill Raddatz,
Official Court Reporter
084-002564

Dated this _____9th___ day

of ___February_____, 2023.

17